# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs April 17, 2013

## STATE OF TENNESSEE v. RANDALL COLEMAN

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2011-B-1027     Cheryl Blackburn, Judge**

---

**No. M2012-01285-CCA-R3-CD- Filed August 8, 2013**

---

A Davidson County jury found the Defendant, Randall Coleman, guilty of five counts of aggravated sexual battery and one count of rape of a child. The trial court sentenced the Defendant to ten years for each aggravated sexual battery conviction and to the mandatory twenty-five-year sentence for the rape of a child conviction. The trial court ordered partial consecutive sentencing for a total effective sentence of fifty-five years in the Tennessee Department of Correction. On appeal, the Defendant contends: (1) the evidence is insufficient to sustain his convictions; and (2) the trial court erred when sentencing him because his sentence is excessive. After a thorough review of the record and applicable authorities, we conclude there exists no error in the judgments of the trial court. Accordingly, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., J., joined. THOMAS T. WOODALL, J., concurs in results only.

Emma Tennent, Nashville, Tennessee, for the appellant, Randall Coleman.

Robert E. Cooper, Jr., Attorney General and Reporter; David Findley, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Sharon Reddick, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from allegations against the Defendant made by the young granddaughter of his then girlfriend.

## A. Trial

At the Defendant's trial, the parties presented the following evidence: J.R.[1] testified that she was born April 28, 1997, and was fourteen years old at the time of the trial. She said that she lived with her mother and that her brothers and sisters lived with their father. J.R. recalled that she often spent time at her grandmother's house, whom she referred to as "Granny." Her granny's given name was Charmaine Rowan. J.R. said that, at the time of these incidents, Rowan lived in a large, three-bedroom apartment in the Spring Branch apartment complex with the Defendant, whom she called Pawpaw, and their two children, Kevin Coleman and Keisha Coleman. J.R. testified that the Defendant was like a grandfather to her.

While the Defendant and her granny lived at the Spring Branch apartment, J.R. visited the Defendant and Rowan frequently, as the apartment was close to J.R.'s school. On one occasion when she was at the apartment, she was on an air mattress between Kevin Coleman and the Defendant. Kevin Coleman kept scooting "his butt" back, in a playful manner, causing J.R. to scoot back also. She recalled that, as she was scooting back, the Defendant moved toward her. When the Defendant moved toward her, his "private part" touched her buttocks. Upon contact with the Defendant's body, the victim scooted away from the Defendant and back toward Kevin Coleman.

J.R. testified that, on another occasion, she was in Rowan's room asleep in the bed when the Defendant came into the room and pulled down her clothing. He then pulled down his own clothing, and put his "private part on [her] private part." J.R. said that, while her legs were spread apart, the Defendant touched his penis to the area where she "pee[d]." She described the Defendant as "going up and down." J.R. recalled that Rowan came in the main door to the apartment, so the Defendant pulled up his pants, and she pulled up her own pants.

J.R. testified about another incident when she was in Rowan's room, and the Defendant pulled his pants down. He told her to "touch it," and he grabbed her hand. He assisted her in "going up and down" on his penis. J.R. testified that nothing came out of his penis on this occasion.

J.R. testified about another incident that occurred while the Defendant lived at the Spring Branch apartment. She said that she was in Kevin Coleman's room. J.R. said she knew that something happened while she was in that room, but she did not want to go into detail because she did not remember it clearly. J.R. said that there were other incidents that happened, but she did not remember them specifically.

---

[1] To protect her privacy, we will refer to the victim by her initials.

J.R. said that the Defendant told her not to tell anyone "what [they had] been doing because," he said, "pawpaw can get in real big trouble."

J.R. recalled that, when she was ten or eleven years old, Rowan and the Defendant moved into a different apartment in "Hallmark at the Park." This apartment had two bedrooms, and the couple lived there with three children, including Kevin and Keisha Coleman. J.R. said that Keisha Coleman did not have her own room and stayed in the same room with the Defendant and Rowan.

J.R. testified that, on one occasion while the Defendant and Rowan lived at "Hallmark," the Defendant told Keisha Coleman to go and wash the dishes. After doing so, the Defendant pulled down his pants, pulled down J.R.'s pants, and pulled J.R. on top of him. J.R. said the Defendant put "his private part where [she] peed" and started moving up and down. J.R. said that she then got off of him.

J.R. testified about another incident at the Hallmark apartments. She said that she was alone in the apartment with the Defendant. She recalled that the Defendant pulled her pants down, pulled his pants down, and opened her legs, spreading them apart. He then put his "private part on [her] private part." The Defendant was "going up and down," until J.R. told him that she needed to go to the bathroom.

J.R. said that, while the Defendant and Rowan lived at the Hallmark apartment, J.R. told Keisha Coleman about the Defendant's sexual conduct toward her. J.R. asked Keisha Coleman to tell her mother. To J.R.'s knowledge, Keisha Coleman did not respond to J.R.'s request and did not tell J.R.'s mother.

J.R. said that, when she was approximately eleven or twelve, Rowan and the Defendant moved to a duplex in the Westchester area ("Tuckahoe Square"). This was a three-bedroom home. When J.R. was visiting the Defendant and Rowan at the Tuckahoe Square duplex, the Defendant was in the room with J.R. He pulled down his pants and told J.R. to "touch it." He then grabbed her hand with his hand and assisted her in rubbing her hand up and down his penis. J.R. said she believed that something came out of the Defendant's penis on this occasion.

J.R. testified that, on another occasion, she was in the living room of the Tuckahoe Square duplex with Rowan and the Defendant. The Defendant told Rowan to go in her room, and Rowan complied with his request. The Defendant then pulled J.R.'s pants down and spread her legs apart. He then put his tongue in her private area and started licking her. The Defendant then put his private in that same place, and he "nutted in [her]." J.R. described

the term "nutted," a phrase she said she learned in school, as meaning that "something" came out of the Defendant's penis onto the victim's vagina. J.R. said that after the Defendant finished, she went to the bathroom to wipe herself off and then went to Keisha Coleman's room to lay down.

J.R. said that, at some point, her mother asked her if anyone was touching her. J.R. did not respond, which indicated to her mother that J.R. was, in fact, being inappropriately touched. J.R.'s mother inquired further, and J.R. told her about the interactions with the Defendant. J.R. said her mother called the police.

J.R. said that she then went to the Child Advocacy Center, and a woman named "Latoya" interviewed her. She also underwent a medical exam at the clinic. After speaking with a police detective, J.R. agreed to have a telephone conversation with the Defendant while police officers taped the conversation.

J.R.'s mother, K.R.,[2] testified that J.R. is her only child and that the two lived alone together. K.R. said she first met the Defendant when she was seven years old, at which time her mother and the Defendant began dating. K.R. said that the Defendant raised her, and the two had never previously had a personality conflict.

K.R. testified that, before she learned of J.R.'s allegations, she allowed J.R. to spend a lot of time at Rowan and the Defendant's home. She said she trusted the Defendant to be around J.R. She said that Keisha Coleman, who was K.R.'s half sister and J.R.'s aunt, was two years older than J.R., and the two went to the same school, so she would leave J.R. at Rowan's to play with Keisha while she went to work. Keisha would also come over to her house to spend the night, and she described her relationship with Keisha as "real[ly] good."

K.R. confirmed that Rowan and the Defendant lived in three locations, and J.R. visited each location: Spring Branch, Hallmark, and Tuckahoe Square. The Defendant often worked outside the home, but he was "always in and out of jobs." Rowan, she said, kept full-time employment.

K.R. said that she was aware that there were times when the Defendant was the only adult present while Keisha and J.R. were in the home. This, however, did not cause her concern because she never felt that J.R. was in an unsafe environment.

K.R. recounted the events leading up to J.R. telling her that the Defendant had touched

_____

[2] In order to further protect the identity of the victim, we will also refer to her mother by her initials only.

her inappropriately. She said that she had a nightmare one night while J.R. was sleeping at the Defendant's house. The nightmare left K.R. feeling unsettled, and she was still feeling unsettled when she picked up the victim the next day. As the two were eating a meal, K.R. said that she "just immediately got up and I asked her . . . [J.R.] ha[s] anybody ever touched you?" K.R. said J.R.'s facial expression "just changed," so K.R. inquired further. K.R. said she asked J.R. if K.R.'s boyfriend "Twin" had touched her inappropriately, and J.R. shook her head "no." She then asked if the Defendant had touched her inappropriately, and J.R. said, "Yes," and tears began falling down her face. J.R. told her that the Defendant had inappropriately touched her more than twenty times. K.R. said she asked J.R. why she had never told her before, and J.R. said she was scared that Rowan wouldn't believe her and that no one else would believe her either. K.R. explained that she asked J.R. specifically about "Twin" and the Defendant because those were the two men who were around J.R. the most.

K.R. said she prayed with J.R. and put her to sleep. After J.R. was asleep, K.R. started to drive to the Defendant's house to confront him. She thought better of it, however, and she decided to call the police. A uniformed police officer came to her house and took a report, and then she was contacted by the Department of Children's Services. K.R. said she took J.R. to be interviewed by the forensic interviewer and also to be medically examined. K.R. was later contacted by a detective, Ed Strickling, who investigated this case. K.R. said that, during the first month after she contacted police, she did not confront the Defendant or Rowan about J.R.'s allegations. K.R. did not tell Rowan about the allegations until the police went to interview Keisha at school.

K.R. said that, after Rowan learned what J.R. had alleged, Rowan tried to "put [the Defendant] out." The Defendant eventually moved out of the Tuckahoe Square duplex. The Defendant attempted to contact K.R., by calling her and leaving her phone messages, but the police had told her not to speak with him, so she did not return his phone calls. She did, however, tell Detective Strickling that the Defendant was repeatedly calling her. The detective suggested that J.R. call the Defendant while police recorded the phone conversation.

During cross-examination, K.R. testified that, in 2009, she was convicted of bringing contraband into a penal facility. K.R. said she was sixteen years old when she gave birth to J.R., and, since J.R. was eight or nine years old, the two had lived multiple places. At times, K.R. had men staying in her apartments with her and J.R. Specifically, she had two consecutive boyfriends, one of whom she dated from 2000 to 2008. The second boyfriend, "Twin" stayed with her occasionally around the time of these allegations. K.R.'s best friend, also a male, stayed with her from time to time. K.R. testified that J.R. also sometimes spent the night with one of K.R.'s girlfriends, some of whom had sons.

K.R. said that she never had any indication that the Defendant was inappropriately touching J.R. She then said that, on one occasion, J.R. began "using the bathroom on herself" while staying at the Spring Branch apartment with the Defendant and Rowan. K.R.'s grandmother told her not to allow J.R. to stay with the Defendant and Rowan anymore, but K.R. thought "nothing [was] going on over there." She took J.R. to be tested for a urinary tract infection, but the doctors did not conduct a medical examination. K.R. questioned J.R. about if "anything" had happened, and J.R. said no.

Keisha Coleman, the daughter of the Defendant and Rowan, testified that, while J.R. was her niece, the two were more like sisters and had been close most of their lives. She said that, until 2010, she lived with the Defendant and Rowan. Keisha recalled a time while living at the Hallmark apartment when J.R. told her that the Defendant had touched J.R. inappropriately. Keisha said that she never told anyone about J.R.'s statements until police contacted her about these allegations. When police asked her about the allegations, however, she told them that J.R. had previously disclosed this information to her. Keisha testified that she never noticed the Defendant being mean to J.R. and that the two seemed to get along fairly well.

During cross-examination, Keisha testified that J.R. usually slept in bed with her when she spent the night at their home. She said that she and J.R. liked to "play tricks" on the Defendant, like waiting until he was asleep and putting tissue in his ears or running away from him. Keisha said that, even after J.R. told her about the touching, J.R. continued to sleep over. She said that she never saw anything inappropriate occur between the Defendant and J.R. while J.R. was at her home. She further testified that the Defendant had never touched her in an inappropriate manner.

During redirect examination, Keisha testified that there were times when the Defendant was alone on the bed with J.R. while the two watched television. She also said that J.R. had never accused anyone else of touching her inappropriately.

Detective Edmond Strickling, with the Metropolitan Nashville Police Department, testified that, in 2009, he worked in the Sex Crimes Unit. In August 2010, he investigated J.R.'s allegations in this case. The detective said that K.R. called police, who took an initial report from K.R. and then referred the case to him. J.R. was interviewed by a forensic interviewer and also medically examined.

Detective Strickling testified that officers use the term "delayed disclosure" when a child does not disclose sexual abuse immediately. He said that he dealt with this type of disclosure frequently. Detective Strickling explained that cases involving delayed disclosure provide the additional challenge that physical evidence is unlikely to be recovered. This type

of case, however, was more difficult because officers would lose "the element of surprise," in that the child would be removed from the home and also because they could not recover physical evidence.

The detective testified that, when investigating J.R.'s case, he first tried to corroborate her statements. Detective Strickling verified that the Defendant and Rowan had lived in the three places mentioned by J.R. He also attempted a "controlled phone call" where J.R. called the Defendant. The Defendant did not make any admissions during this telephone conversation, which the State played for the jury.

Detective Strickling testified that J.R. told him that she had told Keisha Coleman about the abuse. The detective located Keisha at school and interviewed her. Keisha corroborated J.R.'s account of the conversation. The detective testified that he interviewed the Defendant about J.R.'s allegations. The Defendant and the detective met at a Wal-Mart parking lot, and they sat together in the front seat of the detective's car. The detective told the Defendant he was not under arrest and that he was trying to get the Defendant's side of the story. The detective recorded his conversation with the Defendant. In the recording, the Defendant denied the allegations and agreed to submit to a DNA test.

Detective Strickling testified he contacted Rowan, who said she did not want to get involved in the case.

During cross-examination, Detective Strickling confirmed that the Defendant repeatedly denied sexually abusing J.R. during the controlled phone call. He further said that, during his interview in the car with the Defendant, he told the Defendant that J.R. had undergone a medical examination and that some DNA may have been recovered. The detective said the Defendant became "apprehensive" and inquired about what evidence police had found. The Defendant then provided the detective with a DNA sample. During this conversation, the Defendant never changed his denial of any sexual contact with J.R. During redirect examination, the detective stated that, while the Defendant repeatedly denied J.R.'s allegations, there were some inconsistencies and problems with his story.

Rowan, J.R.'s grandmother and K.R.'s mother, testified that she had two children with the Defendant, Keisha and Kevin Coleman. She said she and the Defendant had lived together for twenty-five years, moving on several occasions. Throughout J.R.'s childhood, J.R. spent a fair amount of time at her home. She said that there were times that the Defendant was home alone with J.R., whom J.R. called "Pawpaw."

Rowan testified that she learned about J.R.'s allegations when Keisha came home from school one day and said that police officers had asked her questions about J.R. and the

Defendant. Rowan said, upon hearing this, she was angry and cried. She asked the Defendant "why," and the Defendant denied the allegations. Rowan said she asked the Defendant about the allegations daily. She implored him to tell the truth, and the Defendant eventually told her that "[J.R.] wouldn't leave him alone." Rowan interpreted this statement as an admission that the Defendant had molested J.R. Rowan said she told the Defendant she was going to tell the detective, and he told her that she "better not." This made Rowan scared because she "didn't know what he was going to try to do." She, therefore, never contacted the detective.

Rowan testified that the Defendant told her that J.R. had called him on the phone. He told Rowan that they "think he's stupid." Rowan understood the Defendant to mean that the detective thought he was stupid. Rowan again believed this was the Defendant's confirmation that the allegations were true.

Rowan said that someone from the public defender's office contacted her requesting to speak to Keisha and Kevin. Rowan allowed him to come to her home and speak with them.

During cross-examination, Rowan described her shared residences with the Defendant as "medium" sized. She said she never saw anything in the way that J.R. interacted with the Defendant that raised suspicion. Rowan agreed that J.R. had also spent the night at the home of one of K.R.'s girlfriends. The girlfriend had two young sons, both of whom were close in age to J.R. Rowan said she had previously described the two boys as "nasty" and had expressed her belief that J.R. should not spend the night there.

Rowan agreed she may have told the investigator that her family had threatened to "turn on [her]" if she sided with the Defendant. She also told the investigator that there had been "trouble" within her family because she and the Defendant had never been married. She also told the investigator that "maybe" the Defendant was just "playing" with J.R., and J.R. misunderstood his actions.

Rowan agreed that she had never disclosed her conversations with the Defendant during which he seemed to acknowledge the truth of J.R.'s allegations. The first time she mentioned these conversation was during the trial.

During redirect examination, Rowan testified that, after her conversations with the Defendant when she understood him to be admitting to molesting J.R., she made him leave their home. She never allowed him to return.

Sue Ross, a pediatric nurse practitioner at Our Kids' Center, testified as an expert witness in the area of pediatric nursing and forensic pediatric examinations. She said that

the examinations at the Our Kids' Center normally took between one and three hours. During this time, a nurse practitioner would take a medical history from the victim and also conduct a physical examination. Ross said another nurse practitioner, one who was no longer employed with Our Kids, examined J.R., but Ross had reviewed the report.

The report included J.R.'s medical history. She told the nurse that the Defendant had touched her private parts. She said the first time was while she was on an air mattress with Kevin Coleman and that the Defendant had pushed his penis up against her buttocks. She then told the nurse about a second incident where the Defendant went into her room at her granny's house and pulled down her pants and then pulled down his own pants. She said that the Defendant touched her on her private area but that his penis did not go inside of her. J.R. told the nurse that, each time the Defendant had touched her, he pulled down her pants. She said that she did not think that his penis had ever gone inside of her. J.R. told the nurse about another event where the Defendant put her on his lap and "made [her] move up and down on him."

The nurse's report indicated that J.R. said she did not tell her mother because she was "scared." J.R. described an encounter that occurred while the Defendant lived in the Hallmark apartment where he made her "jack him off." J.R. described the final incident with the Defendant during which the Defendant performed oral sex on her, putting his "tongue on [her] private part." The Defendant then again made her go back and forth on his private, but he never put his private inside of her. J.R. said she never saw anything come out of the Defendant's penis. She also said she felt better once she told her mother about the abuse. Nurse Ross said the report also indicated that J.R.'s medical examination was normal, which was consistent with the type of abuse she alleged.

During cross-examination, Nurse Ross agreed that the "medical history" taken is an oral history from the victim. This information may, or may not, be true.

The trial court then read, and entered as an exhibit, the election of offenses.

John Terry, an investigator with the public defender's office, testified that he interviewed Rowan with regard to this case. The defense then played an audio recording of a portion of his interview with Rowan, wherein she stated that her family had threatened to no longer be in contact with her if she supported the Defendant.

During cross-examination, Terry testified that Rowan expressed numerous times that she felt caught in the middle of this situation.

Based upon this evidence, the jury convicted the Defendant of five counts of

aggravated sexual battery and one count of rape of a child.

## B. Sentencing Hearing

At the Defendant's sentencing hearing, the trial court noted that the Defendant's mandatory minimum sentence for the rape of a child conviction, a Class A felony, was twenty-five years, to be served at 100%. The trial court noted that the issues before it for sentencing were the length of the sentences for the remaining five convictions and also whether those sentences would run concurrently with or consecutive to the rape of a child sentence. The trial court admitted into evidence the presentence report, including the victim impact statement.

K.R. testified that, because she trusted the Defendant, she allowed J.R. to spend significant amounts of time in his home. K.R. testified that, after J.R. disclosed the abuse, J.R. went to counseling once a week for several months. K.R. felt this had helped J.R. in dealing with this situation. K.R. expressed her pride in J.R.'s strength in handling this situation. She said that the Defendant had caused so much pain in their family. She said she could not believe that he would hurt her innocent child and that he would then deny what he had done. K.R. said she had told J.R. that the Defendant would receive the "max" for what he had done to her.

The Defendant testified and maintained his innocence, imploring with J.R. to tell the truth. He said, "What on God's earth would make me want to do this child like that?" The Defendant said he felt like he was the victim in this case because he had never touched J.R. inappropriately.

Martez Coleman, the Defendant's nephew, testified and asked that the Defendant be sentenced to Deberry Special Needs prison, based on his belief that the Defendant was suicidal. Coleman said that he had been involved in prison ministry for sixteen years in the various prisons around Tennessee. Coleman also expressed his love and sympathy for K.R. and J.R.

Based upon this evidence, the trial court found enhancement factor one applicable, that the Defendant had a previous history of criminal convictions. *See* T.C.A. § 40-35-114(1) (2012). The trial court noted that the Defendant had six previous misdemeanor convictions and a probation revocation, but no previous felony convictions. The trial court also applied enhancement factor (14), that the Defendant abused a position of public or private trust "in a manner that significantly facilitated the commission or the fulfillment of the offense." *See* T.C.A. § 40-35-114(14). The trial court noted that the child was left in the Defendant's care, custody, and control and that it was during those periods of time that the abuse occurred. The

-10-

trial court found no applicable mitigating factors. The trial court sentenced the Defendant to ten years for each of the remaining five aggravated sexual battery convictions.

The trial court then considered whether the sentences should run concurrently or consecutively. The trial court determined that the only factor that "would really apply" in this case was number five, that the Defendant had been convicted of two or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and the victim, the time span of the undetected sexual activity, and the nature and scope of sexual acts and the extent of the residual physical or mental damage to the victim. *See* § 40-35-115(b)(5) (2012). The trial court noted that this was a close family situation and that there was a lengthy duration before the abuse was discovered. The trial court found that factor five had been substantiated by the testimony, necessitating some consecutive sentences.

The trial court then determined that Count 1 should run concurrently with Count 2 and that Count 3 should run concurrently with Count 4. The trial court ordered these sentences, however, to be served consecutively to each other, making the effective sentence for those four convictions twenty years. The trial court then ordered that the ten-year sentence for Count 5 be served consecutively to the other sentences and also that the sentence for Count 6 be served consecutively to the other sentences. Accordingly, the trial court imposed a total effective sentence of fifty-five years.

## II. Analysis

On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his convictions; and (2) his sentence is excessive.

### A. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to sustain his convictions because "the proof in the instant case lacked sufficient reliability to sustain" his convictions. The Defendant notes that he denied the allegations during the controlled phone call and also when the detective interviewed him. Further, he points out that he agreed to submit to a DNA test. Finally, the Defendant challenges discrepancies between the victim's recount of the events to the nurse practitioner and her trial testimony. The State responds that credibility determinations are within the province of the jury and the jury resolved those issues against the Defendant. The State asserts, therefore, that the Defendant is not entitled to relief. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of

review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be

drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

All of the Defendant's attacks on the sufficiency of the evidence are based upon credibility determinations. He asserts that he maintained his innocence throughout the investigation, that there were some discrepancies between the victim's trial testimony and her recount of the abuse to the nurse practitioner, and that no one ever saw anything that made them suspect abuse. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *Bland*, 958 S.W.2d at 659. The jury viewed the witnesses, heard their testimony, and observed their demeanor on the stand. The jury rejected the Defendant's claim of innocence. While we acknowledge there may exist some conflict in J.R.'s testimony, it was the jury's prerogative to weigh her credibility and to resolve any conflicts in her testimony. This Court will not reweigh or reevaluate the evidence presented. *Matthews*, 805 S.W.2d at 779. Further, reviewing the charges, the facts elected by the State to support the charges, the evidence, and the convictions, we conclude that there was sufficient evidence to support each of the Defendant's six convictions. The Defendant is not entitled to relief on this issue.

## B. Sentencing

The Defendant contends that the trial court erred when it sentenced him because it improperly enhanced his sentences for the aggravated sexual battery convictions and because it erred when it ordered some of the sentences to run consecutively. The State counters that the effective sentence imposed complies with the purposes of sentencing and is reasonable and that, therefore, the Defendant is not entitled to relief.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2), (d) (2012); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). In 2005, the Tennessee General Assembly amended the sentencing law in order to bring Tennessee's sentencing scheme into compliance with United States Supreme Court rulings on the subject. *See United States v. Booker*, 543 U.S. 220 (2005); *Blakely v. Washington*, 542 U.S. 296 (2004).

Before the 2005 amendments to the Sentencing Act, both the State and a defendant could appeal the manner in which a trial court weighed enhancement and mitigating factors

applied to the defendant's sentence. T.C.A. § 40-35-401(b)(2) (2004). The 2005 amendments, however, deleted, as grounds for appeal, a claim that the trial court did not properly weigh the enhancement and mitigating factors. *See* 2005 Tenn. Pub. Acts ch. 353, §§ 8, 9. As a result, the appellate courts were "left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." *Carter*, 254 S.W.3d at 345-46.

Appellate review of sentences has been *de novo* with a presumption of correctness. *See* T.C.A. § 40-35-401(d) (2012). In a recent decision, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *Id.* at 708; *State v. Caudle*, 338 S.W.3d 273, 278-79 (Tenn. 2012) (explicitly applying the same standard to questions related to probation or any other alternative sentence).

A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

The "presumption of reasonableness" applied to sentences imposed by trial courts "'reflects the fact that, by the time an appeals court is considering a within-Guidelines sentence on review, *both* the sentencing judge and the Sentencing Commission will have reached the *same* conclusion as to the proper sentence in the particular case.'" *Bise*, 380 S.W.3d at 703 (quoting *Rita v. United States*, 551 U.S. 338, 341 (2007)). A presumption of reasonableness "simply recognizes the real-world circumstance that when the judge's discretionary decision accords with the [Sentencing] Commission's view of the appropriate application of [sentencing purposes] in the mine run of cases, it is probable that the sentence is reasonable." *Rita*, 551 U.S. at 350-51.

In conducting its review, this Court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. *See* T.C.A. §§ 40-35-102, -103, -210 (2012); *see also Bise*, 380

S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. *See* T.C.A. § 40-35-401, *Sentencing Comm'n Cmts*.

We conclude that the trial court imposed a within-range sentence based upon application of two enhancement factors and no mitigating factors and after consideration of the purposes and principles of sentencing. The trial court conducted a thorough review of the Defendant's case and circumstances guided by the relevant legal principles. The trial court conducted a proper inquiry about the enhancement factors, and it did not err when it applied the two respective enhancement factors. The trial court did not abuse its discretion when it enhanced the Defendant's sentences for aggravated sexual battery, a Class B felony, to ten years, the midpoint of his applicable eight to ten year sentencing range.

We similarly conclude that the trial court did not err when it ordered partial consecutive sentencing. The trial court imposed partial consecutive sentencing because the Defendant was convicted of two or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and the victim or victims, the time span of the defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual physical and mental damage to the victim or victims. *See* T.C.A. § 40-35-115(b)(5). The trial court took note of the close family relationship between the victim and the Defendant and the "lengthy" time period the sexual abuse went undetected. The trial court also noted that the victim was "obviously scarred" and had to go to counseling. The trial court, on this basis, ordered consecutive sentencing. We conclude that the trial court did not err by so doing. The evidence, including K.R.'s testimony at the sentencing hearing and J.R.'s victim impact statement, support the trial court's finding. The Defendant is not entitled to relief.

### III. Conclusion

Based on the record and aforementioned authorities, we conclude that the evidence is sufficient to sustain the Defendant's convictions and that the trial court did not err when it sentenced him. We, therefore, affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE